**STATE of Missouri, Plaintiff–Respondent,**

v.

**Clarence J. GLOWCZEWSKI, Defendant–Appellant.**

**No. 26331.**

Missouri Court of Appeals, Southern District, Division Two.

July 29, 2005.

Ellen H. Flottman, Columbia, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Leslie E. McNamara, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

JEFFREY W. BATES, Chief Judge.

Clarence Glowczewski ("Defendant") was charged by information with committing the class C felony of possessing methamphetamine, a controlled substance, in violation of § 195.202.[1] After a jury trial, Defendant was found guilty of possessing methamphetamine.[2] In accordance with

---

**1.** All references to statutes are to RSMo (2000) unless otherwise specified.

**2.** Defendant was also charged with committing four additional offenses: (1) the class B felony of manufacturing methamphetamine, a controlled substance, in violation of § 195.211; (2) the class C felony of creation of a controlled substance by possessing red phosphorus, a precursor ingredient of methamphetamine or amphetamine, with the intent to create a controlled substance in violation of § 195.420; (3) the class C felony of creation of a controlled substance by possessing muriatic acid, a precursor ingredient of methamphetamine or amphetamine, with the

the jury's recommendation, the trial court sentenced Defendant to serve six months in the county jail. Execution of the sentence was suspended, and Defendant was placed on three years of supervised probation. This appeal followed.

In Defendant's sole point relied on, he contends the trial court erred in denying his motions for judgment of acquittal because the State did not present sufficient evidence to prove beyond a reasonable doubt that Defendant possessed methamphetamine. We affirm.

## I. Standard of Review

The scope of our review is limited to assessing whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989). The mechanics of this review process were explained in *State v. Grim,* 854 S.W.2d 403 (Mo. banc 1993):

> In considering whether the evidence is sufficient to support the jury's verdict, we must look to the elements of the crime and consider each in turn. Under the *Dulany* standard, we are required to take the evidence in the light most favorable to the State and to grant the State all reasonable inferences from the evidence. We disregard contrary inferences, unless they are such a natural and logical extension of the evidence that a reasonable juror would be unable to disregard them. Taking the evidence in this light, we consider whether a reasonable juror could find each of the elements beyond a reasonable doubt.

*Id.* at 411. Evidentiary conflicts, the determination of witnesses' credibility and the weight to be given their testimony are

within the peculiar province of the jury. *State v. Zimmerman,* 886 S.W.2d 684, 691 (Mo.App.1994). It is not the function of an appellate court to substitute its judgment for that of the jury or to weigh the evidence presented. *Id.; State v. Reed,* 816 S.W.2d 919, 921 (Mo.App.1991).

■■■ In Defendant's point relied on, he argues that the court erred in denying both of Defendant's motions for judgment of acquittal. Defendant filed the first motion at the close of the State's evidence and the second motion at the close of all the evidence. Since Defendant presented evidence in his own behalf after the State rested, however, he waived any claim of error relating to the denial of his motion for judgment of acquittal filed at the close of the State's evidence. *State v. Purlee,* 839 S.W.2d 584, 587 (Mo. banc 1992). Thus, our task is to determine whether the trial judge should have sustained Defendant's motion for judgment of acquittal that was filed at the close of all of the evidence. *Id.* The sufficiency of the evidence to support the verdict will be determined based on all of the evidence presented, including those portions of Defendant's evidence that favor the State. *See State v. Marvel,* 756 S.W.2d 207, 209 (Mo.App.1988); *State v. Campbell,* 655 S.W.2d 96, 97 (Mo.App.1983); *State v. Wood,* 553 S.W.2d 333, 334 (Mo. App.1977).

## II. Summary of the Evidence

Defendant owned an acre of land in Dent County, Missouri. A one-bedroom trailer house, in which Defendant lived alone, was located on the property. Defendant's mother lived in another trailer house located approximately 100 to 200

intent to create a controlled substance in violation of § 195.420; and (4) the class D felony of possessing drug paraphernalia in violation

of § 195.233. The jury found Defendant not guilty of these crimes.

feet from Defendant's trailer. On June 17, 2003, the Dent County Sheriff's Department obtained a warrant to search Defendant's property to determine if methamphetamine was being manufactured there.

Six police officers executed the warrant shortly before 1:00 a.m. on June 18, 2003. Dent County Deputy Rodney Jackson ("Deputy Jackson") was assigned to cover the rear of Defendant's trailer when the warrant was executed. As Deputy Jackson exited his patrol vehicle, he shined his flashlight along the back of the trailer. Just as the light cleared the east end of the trailer, Deputy Jackson spotted Defendant, who appeared to be fleeing from the scene. Defendant stopped moving away from the trailer and raised his hands as soon as he was struck by the beam from Deputy Jackson's flashlight. Defendant had his back to the trailer and was approximately 50 feet past its east end. Even though Defendant was carrying a flashlight and "it was pitch black out there," the flashlight was turned off. Deputy Jackson did not find any methamphetamine on Defendant's person.

Dent County Deputy Richard Piatt ("Deputy Piatt") was assigned to cover the front of Defendant's trailer while the warrant was being executed. As he got out of his vehicle, he observed a suspect run from the trailer towards a nearby creek. Deputy Piatt apprehended the suspect, who was later identified as Ricky Martin ("Ricky").[3] As Deputy Piatt brought Ricky back to the trailer, the officer found a pair of eyeglasses about 25 feet from the east end of Defendant's trailer. The glasses were laying on a well-used trail leading from Defendant's trailer to his mother's trailer. Deputy Piatt later heard Defendant say that the eyeglasses belonged to him.

Deputies Piatt and Jackson returned to the trailer with Defendant and Ricky. When Defendant was asked who owned the trailer, he said his mother owned it. Deputy Piatt stayed with Defendant and Ricky while Deputy Jackson knocked on the front door of Defendant's trailer. No one responded, so Deputy Jackson went inside. The trailer appeared dark from the outside, but the trailer's interior was illuminated by a light. No one else was found in the residence. Once inside, Deputy Jackson could smell the "obnoxious" odor of camp fuel and iodine commonly encountered at meth labs. Deputy Jackson found tubing, red phosphorus, lye, muriatic acid, a camp fuel can, a coffee filter with white residue on it, and various jars and bottles. All of the aforementioned items, which are commonly used to manufacture methamphetamine, were located in plain sight on or around a coffee table beside the bed. On the bed, Deputy Jackson found an electric shaver case containing two used syringes, two new syringes, a deodorant can and a powder can. Later lab tests showed that coffee filter, jars and bottles all tested positive for methamphetamine.

After observing the items in the trailer, Deputy Jackson placed Defendant and Ricky under arrest and read them their *Miranda* rights.[4] Defendant waived his right to counsel and agreed to be questioned. The following events then transpired:

Q. What did you ask [Defendant]?

A. I asked him to come with me, and I took him into the trailer house with me, and then once we were in the trailer house I asked him to be hon-

---

3. The use in some instances of given names, rather than surnames, is for the sake of clarity; no disrespect is intended.

4. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

est with me and tell me where the finished product for the meth lab was at.

Q. Okay. When you say finished product are you talking about methamphetamine powder?

A. Yes, sir, that's correct.

Q. What was his response?

A. He whispered in a real low voice, said it was in Ricky Martin's shirt pocket.

. . . .

Q. Okay. Did you search Ricky Martin?

A. Yes, sir. I went—[Defendant] and I exited the trailer, went to Ricky Martin, and when I—like I said, I already placed both of them under arrest for manufacturing methamphetamine, read them their Miranda rights, went in the trailer, came out and searched Ricky Martin's shirt pocket and there was a pack of cigarettes in his shirt pocket, and between the paper of the cigarette pack and the cellophane of the cigarette pack was a folded up coffee filter and inside that coffee filter was a white residue that field tested positive for methamphetamine.

The white powder in Ricky's shirt pocket was later tested and confirmed to be methamphetamine.

Officers also searched a car that was parked in front of Defendant's trailer. The vehicle belonged to Defendant's girlfriend, Teresa Martin ("Teresa"), who is Ricky's sister. A box on the front seat contained an orange case and a leather pouch. Inside the orange case, officers found a bent spoon with methamphetamine residue on it. Inside the leather pouch, officers found five 1cc syringes. One of

the syringes contained a cloudy liquid that later tested positive for methamphetamine.

At trial, Defendant admitted that he owned the trailer where the meth lab was found and that he kept clothing and other personal belongings inside the trailer. He also admitted that he had been inside the trailer as recently as 5:00 p.m. on June 17, 2003, although he denied there was a meth lab in the trailer at that time. Defendant claimed Ricky set up and began operating the lab later that day.[5]

### III. Discussion and Decision

 Section 195.202.1 makes it unlawful "for any person to possess or have under his control a controlled substance." Methamphetamine is a Schedule II controlled substance. *See* § 195.017.4(3)(b) RSMo Cum.Supp. (2004); *State v. Lingle*, 140 S.W.3d 178, 186 n. 8 (Mo.App.2004). The only issue presented by Defendant's appeal is whether the evidence was sufficient for the jury to find beyond a reasonable doubt that Defendant was guilty of possessing methamphetamine. To sustain a conviction for possession of a controlled substance, the State must prove two elements: "(1) conscious and intentional possession of the substance, either actual or constructive, and (2) awareness of the presence and nature of the substance." *State v. Purlee*, 839 S.W.2d 584, 587 (Mo. banc 1992). The elements of possession and knowledge both may be proved by circumstantial evidence. *Id.*

 A person has actual possession of a controlled substance "if he has the substance on his person or within easy reach and convenient control." § 195.010(34) RSMo Cum.Supp. (2004); *State v. Bacon*, 156 S.W.3d 372, 377 (Mo.App.2005). In the case at bar, no methamphetamine was

---

**5.** After Ricky's arrest, he was charged with the same offenses as Defendant. Ricky pled guilty to the charges and was sentenced to a term of imprisonment.

found on Defendant's person or within his easy reach and convenient control when he was arrested, so he was not in actual possession of a controlled substance. Therefore, the outcome of this appeal turns on whether there was sufficient evidence to prove Defendant constructively possessed methamphetamine. *Bacon,* 156 S.W.3d at 377. Defendant argues that the State failed to present sufficient evidence that Defendant constructively possessed the methamphetamine found in the trailer or in the car.

Taking Defendant's arguments in the order presented, we first address whether the State's evidence was sufficient to make a submissible case of constructive possession as to the methamphetamine found in the trailer. Constructive possession exists when a person has the power and intention at a given time to exercise dominion or control over the substance either directly or through another person or persons. § 195.010(34) RSMo Cum.Supp. (2004); *State v. Booth,* 11 S.W.3d 887, 891 (Mo. App.2000). "Exclusive possession of the premises raises an inference of knowledge and control. However, in a case of joint possession of the premises, more is required." *State v. Hendrix,* 81 S.W.3d 79, 83 (Mo.App.2002). Here, Ricky's evident involvement in manufacturing the methamphetamine that was recovered from his shirt pocket, which was the "finished product" of the meth lab operating inside Defendant's trailer, demonstrates that this case presents an issue of joint possession of the premises.

■■ In a case where there is joint control, "a defendant is only deemed to have possession and control where additional evidence in the record connects him or her to the controlled substance." *State v. Chavez,* 128 S.W.3d 569, 574 (Mo.App. 2004). This additional evidence must demonstrate sufficient incriminating cir-

cumstances to permit the inference of a defendant's knowledge and control over the controlled substance. *Bacon,* 156 S.W.3d at 378; *Hendrix,* 81 S.W.3d at 83. The following additional incriminating circumstances have been determined to raise an inference of knowledge and control in a case of joint possession of the premises: (1) routine access to an area where the substances are kept; (2) being in close proximity to drugs or drug paraphernalia in plain view of the police; (3) finding a defendant's personal belongings with the drugs; and (4) consciousness of guilt. *See Bacon,* 156 S.W.3d at 378; *State v. Smith,* 33 S.W.3d 648, 653 (Mo.App.2000); *State v. West,* 21 S.W.3d 59, 63–64 (Mo.App. 2000). Whether sufficient additional incriminating circumstances have been proven is determined by looking at the totality of the circumstances. *West,* 21 S.W.3d at 63–64.

In the case at bar, all of the additional incriminating circumstances identified above were present. Defendant admitted owning the trailer where methamphetamine was being manufactured and was found. Several officers testified that Defendant was living alone in the trailer at that time. Defendant had routine access to the trailer, and it contained his clothing and other personal belongings. He admitted at trial that he had been inside the trailer only hours before the search warrant was executed. When officers arrived at 1:00 a.m. in the morning to conduct the search, Defendant was observed fleeing from the residence. He was caught only 50 feet from the trailer. At that time, he was moving away from the trailer and had not turned on the flashlight he was holding, despite the "pitch black" conditions. Moreover, Defendant's eyeglasses were found on the ground between the trailer and the spot where Defendant was apprehended, which supports the officer's testi-

mony that Defendant was fleeing from the trailer. Although there was a light on inside the trailer, it could not be observed by officers outside. Upon entry, Deputy Jackson immediately smelled an "obnoxious" odor commonly associated with meth labs. A meth lab was set up in plain view inside the trailer. The drug residue and paraphernalia recovered from the trailer tested positive for methamphetamine. Defendant exhibited consciousness of guilt by denying that he was the owner of the trailer where these items were found. He also made a very significant self-incriminating statement because, when Deputy Jackson asked where the "finished product for the meth lab" was located, Defendant told the officer exactly where to find it. The officer recovered methamphetamine powder in a folded coffee filter from Ricky's shirt pocket. Another coffee filter containing methamphetamine powder that was still drying was found on top of the camp fuel can inside the trailer. Therefore, the jury could infer that the methamphetamine in Ricky's pocket had been produced inside the trailer and removed by Ricky when he fled from police. The jury could also infer that Defendant would not have known where to find the "finished product" unless he had been inside the trailer and knew that methamphetamine was being produced there.

After examining the totality of the circumstances, we conclude that the State presented sufficient evidence of additional incriminating circumstances to permit the inference that Defendant had knowledge of and control over the methamphetamine found inside his trailer and in Ricky's shirt pocket.[6] Since the State's evidence was sufficient to make a submissible case that

---

6. In view of our disposition of the first prong of Defendant's argument, we need not address the related issue of whether the State's evidence was sufficient to permit an inference

Defendant constructively possessed this methamphetamine, the trial court correctly overruled Defendant's motion for judgment of acquittal filed at the close of all the evidence. Therefore, we deny Defendant's point on appeal and affirm the trial court's judgment.

SHRUM and BARNEY, JJ., Concur.

that Defendant constructively possessed the methamphetamine found at the scene in Teresa's car.